Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| A.L. and M.L., <br><br> Plaintiffs, <br><br> vs. <br><br> AETNA LIFE INSURANCE COMPANY, and the NEWMARK GRUBB KNIGHT FRANK WELFARE PLAN. <br><br> Defendants. | COMPLAINT <br><br> Case No. 2:22-cv-00001 - JCB |

Plaintiffs A.L. and M.L., through their undersigned counsel, complain and allege against Defendants Aetna Life Insurance Company ("Aetna") and the Newmark Grubb Knight Frank Welfare Plan ("the Plan") as follows.

### PARTIES, JURISDICTION & VENUE

1. A.L. and M.L. are natural persons. A.L. resides in Union County, New Jersey and M.L. resides in Boulder County, Colorado. A.L. is M.L.'s mother.

2. Aetna is a corporation with its principal place of business in the state of Connecticut. Aetna provides insurance and third party administrative services to a variety of individuals and businesses across the United States and does business in all fifty states.

3. Aetna is the third party claims administrator for the Plan.

4. The Plan is a self-funded employer sponsored welfare benefit plan which provided coverage for the Plaintiffs from January 1, 2016, forward. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*

5. A.L. was a participant in the Plan, and M.L. was a beneficiary of the Plan at all times relevant herein.

6. In 2015 and 2016 M.L. received mental health treatment from Outback Therapeutic Expeditions ("Outback"), a licensed and accredited wilderness therapy program and New Haven Residential Treatment Center ("New Haven"), a licensed facility that provides individualized treatment and sub-acute inpatient care to adolescents with mental health issues. Both facilities are located in Utah.

7. Aetna denied claims for coverage in connection with mental health care provided to M.L. for Outback and New Haven. Prior to January 1, 2016, Plaintiffs received coverage under the Plan when it was funded through the purchase of a group health insurance policy with Aetna. Beginning January 1, 2016, A.L.'s employer self-funded the Plan and utilized Aetna as the Plan's third party administrator. This lawsuit seeks recovery for M.L.'s denied treatment at New Haven from dates of service January 1, 2016 forward, during these dates Plaintiffs received coverage under the self-funded Plan.

8. This Court has jurisdiction over this matter under 29 U.S.C. §1132(e)(1) and 29 U.S.C.§ 1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because the medical treatment at issue in this case was provided in the State of Utah, and Aetna does business and has offices in the State of Utah. Based on ERISA's nationwide service of process provision and 28 U.S.C. §1391, venue is appropriate in the State of Utah. In addition, the Plaintiffs wish to maximize the likelihood that the sensitive nature of the mental health treatment provided for M.L. will not become publicly known and believe the likelihood of maintaining her privacy is increased by bringing their claim in Utah. Also, litigating the case in the State of Utah is likely to reduce costs borne by the Plaintiffs.

10. The remedies the Plaintiffs seek under the terms of ERISA and the Plan are this Court's Order that the Plan must pay the medical expenses incurred for M.L.'s medically necessary treatment, which has been improperly denied, for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), together with payment of prejudgment interest and an award of attorney fees under 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

### M.L.'s Medical History and Treatment

11. M.L. has a family history of alcoholism and mental health issues. She lacked family stability early in life, as she was cared for by several different nannies while her parents had to work. M.L. began seeing a therapist at age five and was diagnosed with Attention Deficit Hyperactive Disorder (ADHD). For the first and second grade M.L. attended a private school.

12. As M.L. grew older, she started avoiding spending time with her family, and was frequently abusive towards her learning disabled sister. She habitually lied, was angry and defiant, and gravitated toward friends who liked to push boundaries. She had her first taste of alcohol in eighth grade, and by the time she started high school she was drinking regularly.

13. M.L. turned to substance abuse as a means of self-medicating her depression and anxiety. This behavior escalated significantly during her freshman year of high school. M.L. would abuse drugs with friends, and started stealing from her family and selling drugs in order to fuel her habit. M.L. then began experimenting with harder drugs. Her frequent intoxication led to withdrawals, poor decision making, and was a source of constant conflict with her family.

14. M.L.'s struggles with her self-esteem resulted in her engaging in self-harming behaviors like cutting in an effort to make herself feel better. M.L.'s school performance suffered, her grades drastically decreased, she frequently skipped classes, was caught cheating, and was given frequent detentions. M.L. was fired from her first job after only being there for a few weeks.

15. M.L.'s parents attempted to enroll her in therapy, but she refused to go. They hired an educational consultant who recommended that M.L. be admitted to Outback.

16. At the time M.L. was admitted to the treatment programs at issue in this case, she was diagnosed as having ADHD, Inattentive Type; Persistent Depressive Disorder with Anxious Distress; Alcohol Abuse; and Cannabis Use.

17. M.L. was admitted to Outback on July 21, 2015.

18. Aetna denied coverage for M.L.'s treatment at Outback and that claim and a portion of the treatment period at New Haven were the subject of litigation in *L. v. Aetna*, civil number 2:18-cv-576 JNP. The plaintiffs' claims in that case were resolved through settlement.

19. M.L. was discharged from Outback on October 20, 2015, her discharge summary gave the following recommendation for her aftercare:

> It is strongly recommended that student transition to a higher level of care and be placed into a residential treatment facility. Without such level of support and clinical sophistication, student will be at a high risk to relapse back into substances, continue her avoidance of dealing with her underlying anxieties and be able to use her psuedo-adult [sic] like presentation to fool professionals on an outpatient basis. Student is quite sophisticated at presenting well and being deceptive of her peers and adults so she needs a clinically sophisticated approach in order for her to fully resolve the issues at hand.

## **TREATMENT AT NEW HAVEN**

20. M.L. was admitted to New Haven on October 21, 2015, directly following her treatment at Outback.

21. On October 26, 2015, Aetna sent a letter denying payment for M.L.'s treatment at New Haven. Aetna gave the following justification for the denial:

> After review of the information received, the specific circumstances of this member and the Level of Care Assessment Tool (LOCAT) Guidelines for Mental Health Residential Treatment, coverage for the requested level of care is denied. The information received indicates that the member is medically stable and not acutely suicidal, homicidal or psychotic. She is behaviorally in control. The member does not require mental health residential treatment. Further treatment of this member could be provided in outpatient treatment.
>
> (Medical Necessity Denial) This coverage denial was based on the terms of the member's benefit plan document (such as the Certificate of Coverage or benefit plan booklet/handbook, including any amendments or riders). The plan does not cover services that are not medically necessary. …

22. On March 31, 2016, A.L. and M.L.'s father, S.L., submitted a level one appeal of the denial of M.L.'s treatment at New Haven. They wrote that the October 26, 2015, denial letter only denied coverage for October 21, 2015, and asked that Aetna consider all of M.L.'s treatment at New Haven, from her admission forward.

23. A.L. and S.L. argued that the reviewer improperly utilized Aetna's LOCAT to justify the denial. They claimed that the reviewer denied payment because M.L. did not meet *all* of LOCAT's admission criteria, when LOCAT explicitly states that the member only needs to satisfy *one* of its admission criteria to justify admission.

24. A.L. and S.L. stated that M.L. met many of the LOCAT admission criteria, any of which should have been sufficient to justify her admission according to LOCAT, and she should not have been disqualified by the reviewer just because she did not meet the acute dangerousness admission criteria.

25. They wrote that M.L. had dual diagnoses of substance use as well as mental health problems, and that the residential treatment she had received was necessary in order to ensure a successful long-term recovery. A.L. and S.L. included a copy of M.L.'s medical records with the appeal.

26. A.L. and S.L. quoted from an undated letter written by M.L.'s primary therapist at Outback Traci Schrunk LCSW, it stated in part:

> It is my recommendation that M.L. be placed in a residential program that will have 24 hour supervision, a clinically driven milieu, and academics on site that can assist M.L. with her anxiety and struggles in the classroom. It is only been [sic] with an intensive, structured, clinical program that M.L. has been able to lower her defenses and begin the process of doing the long term clinical work that she will need to in order to be a stable, functional adolescent. …
>
> M.L. is not a candidate for outpatient therapy at this time as she will quickly regress into dangerous behaviors and refuse to participate in therapy, which will, once again, impact her academic performance. She will need to be in an

environment that can simultaneously address both the pervasive emotional needs and her substance abuse issues that impact her ability to function on a daily basis.

27. A.L. and S.L. argued that the medical professionals who had treated M.L. in person had all recommended a residential level of care. They contended that Aetna's failure to provide specific references to the clinical record it had relied upon to deny care, was a violation of ERISA and made it difficult to effectively advocate on behalf of their daughter.

28. A.L. and S.L. included a psychological evaluation with the appeal conducted by licensed psychologist Dr. Michael Sheffield on August 18, 2015. Dr. Sheffield recommended:

> …Following her completion of the wilderness program, she needs continued treatment at a residential program with an on-site school. Outside of a structured treatment environment she is at high risk for continued emotional and behavioral problems, substance use, and academic underperformance. …

29. On May 3, 2016, Aetna sent A.L. and S.L. a letter denying her level one appeal and stating that the treatment was not medically necessary. The reviewer wrote in part:

> For the dates under consideration she was medically stable. She was not actively suicidal, violent, manic, psychotic, severely depressed, or otherwise in crisis. She was cooperative with all aspects of her treatment. She was not in need of strict limit setting or excessive staff involvement.
>
> There is no evidence that she was a credible risk for self-harm or otherwise in need of 24 hour supervision and treatment. Records provide no compelling indication for care in a residential setting during this time, or that care could not reasonably continue safely and effectively in an outpatient setting. LOCAT criteria do not support residential treatment as the medically necessary level of care but do support partial hospitalization treatment. Denial is upheld.

30. A.L. exhausted her appeal obligations under the terms of the Plan.

**FIRST CAUSE OF ACTION**
**(Claim for Recovery of Benefits Pursuant to 29 U.S.C. §1132(a)(1)(B))**

31. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon Aetna, acting as a fiduciary of the Plan, to discharge its

duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

32. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators and their agents provide a "full and fair review" of claim denials. 29 U.S.C. §1133(2).

33. Aetna breached its fiduciary duties to A.L. and M.L. when it failed to comply with its obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the interest of the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to them and to provide a full and fair review of A.L. and M.L.'s claims.

34. Aetna breached its fiduciary duties to A.L. and M.L. when it failed to discharge its duties "in accordance with the documents and instruments governing the Plan. …" 29 U.S.C. §1104(a)(1)(D).

35. The actions of Aetna in failing to provide coverage for M.L.'s medically necessary treatment and administer the Plan in accordance with the requirements of generally accepted standards of care applicable to treatment of mental health and substance use disorders provided at intermediate, sub-acute levels of care are violations of the terms of the Plan.

## SECOND CAUSE OF ACTION
### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

36. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

37. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

38. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

39. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(H).

40. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for M.L.'s treatment at New Haven include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Aetna exclude or restrict coverage of medical/surgical conditions based on criteria for medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Aetna excluded coverage of treatment for M.L. at New Haven.

41. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Aetna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that M.L. received.

    Aetna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Aetna's denial letters such as "She was not actively suicidal, violent, manic, psychotic, severely depressed, or otherwise in crisis."

42. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that M.L. received.

43. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

44. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

45. Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

46. The actions of Aetna and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and

coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

47. The actions of Aetna and the Plan requiring that M.L. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

48. Defendants offer little justification for the denial beyond the absence of acute level symptoms, which suggests that if Aetna had evaluated M.L.'s treatment using other more appropriate guidelines, it likely would have been approved.

49. In this manner, Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the criteria utilized by the Plan and Aetna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

50. The actions of Aetna, as outlined above, have caused damage to A.L. and M.L. in the form of denial of payment for medical services in an amount totaling over $120,000

51. The violations of MHPAEA by Aetna and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring

  compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by Aetna and the Plan from participants and beneficiaries of the Plan, as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

52. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and an award of attorney fees and costs under 29 U.S.C §1132(g).

1. Judgment in the total amount that is owed for M.L.'s medically necessary treatment under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

//

4. For such further relief as the Court deems just and proper.

DATED this 31st day of December, 2021.

                                                 /s/ Brian S. King
                                                 Brian S. King
                                                 Attorney for Plaintiffs

Plaintiff's Address:
Union County, NJ